Anthony Imbesi and Hazel Imbesi v. Commissioner.
Imbesi v. Commissioner
Docket No. 1666-62.
United States Tax Court
T.C. Memo 1964-276; 1964 Tax Ct. Memo LEXIS 63; 23 T.C.M. (CCH) 1678; T.C.M. (RIA) 64276; October 21, 1964
Herman H. Krekstein, 1528 Walnut St., Philadelphia, Pa., and Merle A. Wolfson, for the petitioners. Max J. Hamburger and Francis J. Cantrel, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of petitioners for the taxable years 1954 to 1959, inclusive, in the following respective amounts: Year
Income tax
1954
$30,638.70
1955
59,567.62
1956
80,943.88
1957
24,139.35
1958
37,245.59
1959
70,464.66
With the exception of one, all issues *64 raised by the pleadings have been settled by the parties which settlement will be given effect under Rule 50. The sole remaining issue is the correctness of respondent's disallowance of claimed business losses for the following taxable years in the respective amounts indicated below: Taxable
Amount of loss
year
claimed per return
1955
$ 16,804.70
1956
40,548.42
1957
38,684.93
1958
48,201.81
1959
130,921.07
Findings of Fact All agreed upon facts are found as stipulated. Petitioners, husband and wife during the taxable years involved herein, have resided since about 1957 at Estell Manor, New Jersey. Petitioners filed joint individual income tax returns for the taxable years 1954 to 1959, inclusive, with the district director at Philadelphia, Pennsylvania. The returns were filed on a cash, calendar year basis. Anthony Imbesi, hereinafter referred to as petitioner, since about 1930, has been engaged in the manufacture, bottling, and promotion of the soft drink popularly known as "7-Up" in the Philadelphia - New Jersey area. When he first began to promote the 7-Up product in the Philadelphia - New Jersey area, it was not a popular brand of soft drink. *65 In his own words, its status was "nowhere." It was petitioner's own personal initiative and efforts that developed and promoted it into the popular soft drink product which it now is in the Philadelphia, New Jersey, Delaware, and Maryland areas, largely through his own efforts. The following schedule sets forth the 7-Up bottling corporations and partnerships in which petitioner was active as president, director, and partner: SALARY (s) OR PARTNERSHIP DISTRIBUTION (pd) RECEIVED
Imbesi
posi-
Name of company
tion
1955
1956
1. 7-Up Bottling Co. of Bal-
timore, Inc., Catonsville,
Presi-
Maryland
dent
(s) $15,000.00
(s) $15,000.00
2. 7-Up Bottling Co. of Wil-
mington, Inc., Wilming-
Presi-
ton, Delaware
dent
(s) 5,000.00
(s) 5,000.00
Director's
fees
1,500.00
3. 7-Up Bottling Co. of Phil-
adelphia, Inc., Philadel-
Presi-
phia, Pa.
dent
4. 7-Up Bottling Co. of Cam-
Part-
den, Camden, New Jersey
ner
(pd) 13,669.71
5. 7-Up Bottling Co. Salis-
bury, Salisbury, Mary-
Part-
land
ner
(pd) 933.41
6. 7-Up Bottling Co. North-
Part-
west, Philadelphia, Pa.
ner
(pd) 17,158.96
(pd) 15,891.17
7. 7-Up Bottling Co. Bridge-
ton, Bridgeton, New Jer-
Part-
sey
ner
(pd) 17,194.76
(pd) 22,723.93
*66 SALARY (s) OR PARTNERSHIP DISTRIBUTION (pd) RECEIVED
Name of company
1957
1958
1959
1. 7-Up Bottling Co. of Bal-
timore, Inc., Catonsville,
Maryland
(s) $15,000
(s) $15,000
(s) $15,000
2. 7-Up Bottling Co. of Wil-
mington, Inc., Wilming-
ton, Delaware
(s) 10,000
(s) 10,000
(s) 10,000
3. 7-Up Bottling Co. of Phil-
adelphia, Inc., Philadel-
phia, Pa.
24,000
(s) 24,000
4. 7-Up Bottling Co. of Cam-
den, Camden, New Jersey
(s) 15,000
5. 7-Up Bottling Co. Salis-
bury, Salisbury, Mary-
land
6. 7-Up Bottling Co. North-
west, Philadelphia, Pa.
(s) 12,000
(s) 12,000
7. 7-Up Bottling Co. Bridge-
ton, Bridgeton, New Jer-
sey
(s) 20,000
(s) 20,000
(s) 10,000
In addition to his general supervisory duties as president, director, stockholder, or partner in the above 7-Up bottling companies, the petitioner actively engaged in sales promotion with respect to certain of these companies and was reimbursed by the corporations involved for his out-of-pocket expenditures incurred in connection with his travel, hotel, lunch, and other expenses. He maintained records of these expenses for which he received reimbursement. These records *67 kept by him relative to expenses incurred were detailed and comprehensive, relative to hotel bills, entertaining clients, lunches, etc. William Roger Davis was the comptroller of the 7-Up bottling corporations and partnerships in which petitioner had financial interests, and he was familiar with the business operations of the various companies. Davis was an accountant of many years experience, and he maintained the records of these several companies. These records of the 7-Up companies were complete, detailed, and in excellent business form. Inventory control records relative to the 7-Up bottling operations were maintained throughout the years in question in such careful and detailed form, and operations were so efficient that generally the closing inventories of bottled 7-Up products varied comparatively little from opening inventories for each year despite the substantial gross sales of the companies. Davis also advised petitioner with respect to his personal accounting. He prepared the details necessary for the preparation of petitioners' individual income tax returns for the years 1955 to 1959, inclusive, and turned these details over to a certified public accountant for preparation *68 of the returns. In addition to petitioner's business activities in connection with the management and promotion of the 7-Up bottling companies referred to, he was also a director in an advertising agency during the years involved herein, in which he directed advertising. He was also an officer and director in the Carpenter Realty Company, Philadelphia, Pennsylvania, during the same years, and it was his responsibility to buy and sell the real estate of the corporation, which also held title to the real properties on which his various bottling company buildings were located. He was also an officer and director of the Sinda Efficiency Apartments, located at Ocean City, New Jersey. The following schedule sets forth the director's fees and management fees received by the petitioner from Hamblett Advertising Agency, Carpenter Realty Company, and Sindia Efficiency Apartments for the years 1955 through 1959: Hamblett
Carpenter
Sindia
Type of
Advertising
Realty
Efficiency
Year
compensation
Agency
Company
Apartments
1955
Director's fees
$ 879.87
$2,000.00
$1,300.00
Management fees
6,000.00
1956
Director's fees
726.62
2,000.00
400.00
Management fees
6,000.00
1957
Director's fees
2,000.00
1,550.00
Management fees
4,149.37
6,000.00
1958
Director's fees and Management fees
1,203.44
8,000.00
1,900.00
1959
Director's fees and Management fees
2,934.06
8,000.00
800.00
*69 Petitioner had been interested in and had owned English setters since boyhood. He considered the English setter a beautiful, intelligent, "noble" animal. He feared they were declining in popularity as sporting dogs - "fading from the picture," as he described it - and he was determined to preserve and enhance the English setter as a noble breed of animals. In his own words: "That's primarily why I decided to breed them and tried to improve the breed." Petitioner raised English setters "in a small way" until about 1946 although the record discloses that he claimed losses in connection with their breeding since 1943. Moreover, he had been advertising setters for sale in "The American Field," which is one of the outstanding sporting-dog magazines in the United States, since 1938. Petitioner's setters had been in competition in field trials conducted throughout the United States for a number of years prior to 1951. Field trials are conducted for the purpose of establishing the best dogs of a given class in open field competition. By 1952 petitioner's setters had won numerous field trials for their excellence in the field. He owned such outstanding and nationally known setters as *70 Dick's Beau Gene, Wampanoag Inspector, Briardale Jake, and Briardale Ben, all winners and runners-up in national and regional field competition. Wampanoag Inspector was an exceptionally fine setter, having won, as of 1952, some 18 places in open field competition. In 1954 he was runner-up (second) in the classic event of American sporting dogs, the Grand National Championship held at Grand Junction, Tennessee. Again, in 1953, petitioner's setters performed in outstanding fashion in national field trials. It was petitioner's usual practice to sell pups at about 3 months of age, and those selected for training for field events were usually about 9 months old. In his field trials he employed handlers in some cases and in some cases he handled the dogs himself. He attended approximately 100 of these field trials. Petitioner advertised his setters consistently in "The American Field" prior to and during the years in question. The fact that he was a breeder was known in many countries, and he sold dogs in the United States, Canada, and abroad, as far away as Japan. As of 1955 petitioner realized that his dog-breeding activities were not profitable nor likely to be profitable. He thereupon *71 decided to switch over to horses so he purchased a couple of mares and decided to go into the thoroughbred horse-breeding field, putting to use in his horse-breeding activities the knowledge acquired in his dog-breeding activities. He thought there would be "big money" in this activity. Despite his recognition as of 1955 that his dog-breeding activities were not profitable, petitioner continued that activity, with substantially the same advertising, as late as 1963. While still engaged in breeding and selling dogs, and prior to the years at issue, petitioner decided to raise some Aberdeen Angus cattle and place them on his farm at Pipersville, Pennsylvania, "to make money." He continued to raise cattle for about 3 years, but abandoned the cattle-raising project at the end of this 3-year period because he "could not make any money." He "could not make a profit." In "about" 1957 or 1958, petitioner purchased 2,500 acres of land in New Jersey, and there established his home on a place known as Estell Manor. He moved his dog kennels there. In switching from his dog activities to his horse activities, petitioner was attracted by the prices he understood were paid for thoroughbred *72 yearlings at public sales. When he entered the horse-breeding and -racing field, petitioner was not at all familiar with thoroughbred racing. During the years at issue petitioner owned 25 or 30 head of horses which were trained for racing by a "public trainer" who did so on a fee basis. In 1960 he, for the first time, employed a full-time trainer who trained petitioner's horses exclusively. During the years 1955 to 1959, inclusive, petitioner received no income from stud fees with respect to his horses and the record is vague as to possible income from race winnings. We find there were none. Thoroughbred horse breeding and racing is generally not a profitable activity. Petitioner's trainer, subsequent to 1960, urged petitioner to cull his horses so that those which did not "earn a living" would be disposed of and thus reduce the expense of petitioner's horse activity. We find from an absence of showing to the contrary that petitioner did not do so. During the taxable years 1955 through 1959 petitioner kept no detailed books and records of his income and expenses with respect to his dog and horse activities. Although he engaged extensively in field trials of his dogs over the *73 years in question and incurred substantial expenses in connection therewith, he kept no records of their performance at these trials, their places won, or detailed expenses with respect thereto. He relied on the records of "The American Field" for this purpose. Nor did he keep any detailed records of the races in which his horses participated, the number of starts, wins, places, or other details as to expenses. He relied on the respective tracks for these data. Petitioner commingled income from these sources with his general personal income in a single bank account although in his 7-Up bottling activities each corporation and each partnership had its own separate business account. He paid the expenses of his dog and horse activities from the same personal account. He did not segregate in any records kept for that purpose, the income realized from the sale of dogs or horses, or the stud fees received from dogs or horses, or the winnings from horse racing, and there was no identification of the particular source, such as the name of the dog or horse, of any such income. Petitioner made no attempt to allocate general overhead expenses, such as labor, repairs, insurance, and taxes, to *74 dogs or horses. Nor did he make any attempt to keep cost accounting records for the purpose of determining the cost of raising individual dogs or the desirability of retaining any horse. No dog inventories were maintained. At the end of each taxable year and for the purpose of preparing tax returns, accountant Davis would use petitioner's bank statements and checkbooks to make up worksheets of income and expenses of the dog and horse activities, lumped together and without identification as to each category, and these worksheets were then used by petitioner's accountants in preparing his Federal income tax returns. The following schedule sets forth the income, expenses, and losses claimed by petitioners in their tax returns for the taxable years 1943 to 1959, inclusive. Year
Income
Expenses
Loss
1943
$ 208.32
$ 2,766.80
$ 2,558.48
1944
322.89
5,078.87
4,755.98
1945
None
6,081.95
6,081.95
1946
None
7,337.22
7,337.22
1947
1,258.28
13,967.22
12,708.94
1948
5,111.88
16,470.02
11,358.14
1949
4,136.83
10,531.02
6,394.19
1950
4,478.35
17,895.71
13,417.36
1951
3,404.29
20,811.63
17,407.34
1952
7,462.07
24,880.96
17,418.89
1953
9,430.69
25,003.39
15,572.70
1954
7,591.46
27,096.75
19,505.29
1955
$17,426.40
$ 34,231.10
$ 16,804.70
1956
18,005.01
58,553.43
40,548.42
1957
57,123.80
95,808.73
38,684.93
1958
92,524.50
140,726.31
48,201.81
1959
31,595.88
162,516.95
130,921.07
Total
$409,677.41
*75 An approximation of a portion of such claimed losses attributable to petitioner's activities in breeding, raising, and selling dogs and engaging in field-trial competition is as follows: 1955
1956
1957
1958
1959
$12,782.67
$6,680.72
$15,003.22
$2,831.52
$3,355.61
Ultimate Finding Petitioner's activities above set forth with respect to English setter dogs and thoroughbred horses constituted hobbies and did not constitute the carrying on of business for profit. Opinion The issue remaining for decision is one of fact turning upon the primary purpose underlying petitioner's raising of English setter bird dogs and thoroughbred racehorses during the taxable years 1954 through 1959. If these activities or either of them constituted the conduct of business, the expenses incidental thereto are deductible under section 165(a) and (c), Internal Revenue Code of 1954. [1] If they are not businesses and do not constitute transactions entered into for profit, they are personal living expenses which are nondeductible under section 262 of the 1954 Code. [2] We find them to be personal living expense and hence nondeductible. *76 Petitioner's actual business affairs consist primarily in the development of the successful distribution for profit of a soft drink known as 7-Up. His conduct of this business and other business ventures is characterized by an evident business acumen and has consistently resulted in success. Since his boyhood it is apparent that he has been interested in bird dogs primarily of the English setter breed. In about 1943 he began the activity of raising such dogs primarily because he had "loved the English Setter since * * * [he] was a boy and * * * [he] just couldn't see that noble breed of animals fading from the picture." His purpose was to "improve the breed" in competition with the pointer bird dogs which had by that time won prominence in bird-dog field trials throughout this country. We find from the record that this continued to be his primary purpose through the years at issue, for the record fails to disclose any occurrence or event which would lead us to believe his purpose had changed to one motivated by profit. It seems clear to us that he intended to continue the breeding of these dogs regardless of whether or not he could derive a profit therefrom. His motivation was *77 the personal pleasure he derived from breeding and handling these dogs in the field and the increased public recognition which resulted from their success in field-trial competition. The activities of petitioner in his attempts to improve the English setter clearly constituted a hobby. The hobby was expensive to maintain as shown by the consistent and sizeable losses which resulted. Petitioner's income from the sale of dogs and the income derived from stud fees were not the motivating force underlying this activity. Such income was sought by him for the understandable reason that he wished to lessen the expense of carrying on this hobby. What we have said above with respect to petitioner's raising of bird dogs has equal application to his activities in the breeding and racing of thoroughbred horses. With respect to both hobbies, his method of bookkeeping, such as it was, was so haphazard by comparison to the excellent and accurate method used by him in his activities which were clearly profit motivated that we are forced to conclude that his purpose in carrying on the former was other than his purpose with respect to the latter. Although he maintained separate bank accounts with *78 respect to each corporation and partnership through which his admitted business affairs were conducted, he used his personal bank account as the depository for all receipts from his dog and horse activities. He made no attempt to maintain a system of cost accounting with respect to either his dog or horse activities nor did he, during the years at issue, make any attempt to lessen his costs by the culling of either his dogs or horses. This is to us inconsistent with the existence of a profit motive on his part. Petitioner's prospects of making a profit with respect to either his dog or horse activities were clearly negligible at the time he entered upon each. The fact the he now may show a profit from the latter is, by itself, of little benefit to him, for we are satisfied from the record as a whole that, even though he has taken advantage of his opportunities to derive income therefrom, he would continue to carry on these activities at a financial loss if necessary because of the personal pleasure accruing to him. No further discussion of the facts is necessary for nothing appears in the record, with the exception of petitioner's self-serving reiteration of a profit motive, which *79 would serve to sustain his burden of proof herein. As to his statement of a profit motive, we find no support therefor elsewhere in this record. Decision will be entered under Rule 50. Footnotes
1. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. No loss described in this paragraph shall be allowed if, at the time of the filling of the return, such loss has been claimed for estate tax purposes in the estate tax return. ↩
2. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.↩